United States v. Foster. We'll be pleased to hear from Mr. Howard first. Thank you, Your Honor. Good morning. May it please the Court. My name is David Howard and I represent the appellant, Mr. Lawrence Foster. Mr. Foster stands convicted of one count of conspiracy to commit mail fraud and seven substantive counts of wire fraud. Convictions result from a jury in the second of two jury trials. He was convicted in the first as well but was granted a new trial by the District Court. Mr. Foster owned and operated a company by the name of Paradise's Mine, the primary mission of which was to sell lots of land in Rumkey, Bahamas, undeveloped land. The secondary mission was to mark, to use lots of that land from which he was selling as collateral to secure loans to fund the marketing operation. The theory of the prosecution was that Mr. Foster was deceptive in his marketing practices in three primary ways, that he claimed ownership of the land or that he claimed his company, Paradise's Mine, owned the land, that he claimed celebrities had acquired land from the track from which he was selling, and also that the press releases that he used in his marketing effort were deceptively doctored to appear as though they were news articles. We contend that none of the representations made by Mr. Foster were materially deceptive for three reasons. As to the ownership of land, Mr. Foster was in contract with the owner of the land. The contract is Exhibit 8001, which I commend to the court. Exhibit C to which states as follows, and I quote, the company has been, the company referring to Paradise's Mine, Mr. Foster's company, the company has been provided full and complete ownership interests, equity interests, and all legally permissible rights obtained from each vendor through this agreement. Accordingly, this agreement provides Paradise's Mine, LLC, the ability to exclusively market and represent itself as to having true and complete ownership rights and claims without limitation whatsoever for all real property owned by and in conjunction with the vendors in excess of 16,500 acres within the Commonwealth of the Bahamas. He didn't actually own it, did he? Sunward Properties owned it. Well, to the extent that he had a contract with Sunward Properties that gave him an ownership, joint ownership interest, then he did own it. Whether or not title had passed from one to the other, I think was immaterial. He had a contractual ownership right, which was not contested by Sunward. Well, but whether Sunward really owned the land was being contested, right, with the Bahamian authorities. Well, as was testified to by Mr. Ken Toppin, who was a lawyer there and is the executive director of Sunward Holdings. Mind you, he was a suspended lawyer at the time for unrelated matters. But he indicated that essentially in the Bahamas, you don't have absolute title ever. All title is relative, and there are always from time to time disputes that arise. That was also testified to by a Miami attorney, Mr. Jose Diaz-Cueto, who acquired some of the land from the same tract from Sunward and has since sold lots. People to whom he sold have built on it, and they're living there now without any problem. So the question of whether or not it's contested, there might be contested. There has been no holding or ruling that Sunward did not own it, and Sunward is operating as though it owns it without incident. Tell me, did any of these investors, did anybody end up acquiring title? They did not. And the reason they did not is because what they were purchasing, and they knew and testified they were purchasing, were options to purchase land, and they would only be able to receive title once they paid a 10% stamp tax. They didn't pay the stamp tax, and so therefore they did not receive the title. But they had the right to, and their option contracts, putting the world on notice that they're the ones with the right to pay the stamp tax and acquire title, is registered with the repository in the Bahamas that announces such ownership interests. What percentage commission did Mr. Foster pay for the salesman for these lots? It varied, but there was one, I think the one that seemed to be the greatest or arguably excessive was 50% to one of his salespeople, at least one, that he paid 50%. I suspect that it would have been difficult to get somebody as a salesperson to engage in the pursuit of selling undeveloped land in the Bahamas, and so he offered them these high commissions. However, if the land is sold, the person who owns it and sells it, I would assume is entitled to do what he will with the money that he receives from the sales. The records show that Mr. Foster spent a penny in actually developing the land that he got from these, the money from these investors. I think the record indicates there may have been something in the neighborhood of pennies spent in that regard. So I would concede that. However, Mr. Foster had a website. He never at any time advertised or suggested that he would be developing the land. It said, we're market makers and we're selling you undeveloped land. And so therefore, he never had an obligation to develop the land and he didn't. Was Joe Montana one of the celebrity people who advertised and purchased land? Yes, he was. Did Montana actually ever purchase the land or did he just get it as for his endorsement? Well, he got it for his endorsement. And we would contend that a celebrity's, the very viable and valuable asset of a celebrity's celebrity does have purchasing power. So to the extent that he gets it by barter in exchange for his celebrity attaching his name to it, that is in essence a purchase. But Mr. Montana never got it according to the testimony at trial either. According to the testimony at trial, he didn't get it and he did not get it. But what did transpire with regard to Mr. Montana is after securing his, after signing his service agreement, he sent correspondence to Mr. Foster or to Paradise's option and received title. They sent him back documentation documenting that they acknowledged that he wanted to make that choice and that steps were taken and his option was registered accordingly. They then also sent him a package which he had to complete and fill out. For the Foreign Investment Board there, there is a minor, very cursory background check that's done to make sure that if you're going to build in the Bahamas, you're not an axe murderer. And they never sent it back. So I don't think Paradise's mind was in a position to know that they abandoned the contract. The last they knew was they... But their position was they didn't abandon it. That they demanded clear title before Mr. Montana could be used as a spokesperson. And then the problematic part for me is not so much that he didn't get it, because as you say, there might have been reasons why he didn't get it. But Paradise began using him anyways, despite the fact that he said, don't use my likeness or my promotion until I receive clear title. He didn't get it for whatever reason and yet they start using him and calling him an owner of land there. Which is an understandable concern, except Mr. Montana's contract did not just say that. It has two provisions regarding what Paradise's mind would be allowed to do. The first does, as the court indicated, indicated that once there has been a successful and complete fee symbol transfer to lot 19, pursuant to the terms hereof, the professional will use his best efforts to provide the services identified within 60 days thereafter. Or unless otherwise specified. There is another provision. That provision says, and I quote, and it's an attachment won to Mr. Montana's agreement, the company may, upon the execution of this agreement, market and release information pertaining to the professional's acquisition of land specified therein. But there's no acquisition of land. There's acquisition of an option contract, which gives. That's not what the contract says. Well, his, his, an option contract gives him the right to the land. I don't, I don't dispute that. But that the provision you read doesn't say the execution or the transfer of the option. It says the acquisition of land. Well, my, our contention is that the option. Mr. Montana could have taken that option and sold it. It's his. It didn't say the acquisition of title, which is what the other provision says. It says the actual acquisition of land. Once he has an option contract, he owns that asset. Does the record have any reflection of what a value of that option would be? Well, it's land, so. No, it's not land. It's an option. Is there any testimony as to what the value of that option was? Well, there was testimony by Mr. Toppin, who indicated that that option transfers an ownership interest in the land. And that ownership interest can be sold and it can be used as an asset. Since you mentioned Mr. Toppin, he was a director of Sunwood, right? He was. And Sunwood owned the land, right? In conjunction with Paradise's mining. No, it actually had title. Let's talk about title. Sunwood had the title, right? It did. And Mr. Toppin's a director of Sunwood. He is. And I know he's a disbarred lawyer, but this was his testimony at trial. Paradise's mine does not own land in the Bahamas. Paradise's mine has a proprietary contract to sell and market the land. That's what he testified to, correct? That is what he said. All right. So your client did not own the land in any legal sense. They had a right to contract to buy it and to sell it. That's all they had. He's a lawyer. He was a pining. He's the director of Sunwood who owned the title. So why is the jury entitled to believe that? Well, the part of the testimony that the court just read, it continues as I continue to inquire of him and confront him with the actual language of the contract, which says you have an absolute ownership interest in conjunction with Sunwood. You admit Sunwood held the title. I'm not even sure Sunwood had the title. Did even Sunwood have the title? There isn't. Title in the Bahamas is established by title opinions, and there were several title opinions which did establish ownership. Am I correct? The website of Paradise's mine never mentioned Sunwood, right? It did not. Okay. Sunwood was of the opinion that or both Paradise's mine was of the opinion that it owned the which says from the owner, you own it with me jointly, whether or not he has an obligation to disclose all the partners that he owns the land with. I have one other question about the loss before you sit down. And I think Judge Jordan has a few questions. Your Paradise's mine collected $8.3 million from the investors. Is that approximately correct? That is correct. And they returned only about $280,000. Only $280,000. Yes, that is correct. To the investors as interest payments before it all fell apart. And there was no evidence that any other payment had come due at the time. I understand that. I'm just talking about the bottom line numbers. Yes. They took in $8.3 million, and they returned $280,000. That is correct. All right. I have two questions, Mr. Howard. There was, according to the briefs, I haven't gone into the record to check this. There was approximately $1 million in Paradise's bank account at the time it got shut down. That is correct. Was that amount credited toward loss or return to investors or liquid use in any way? It was in the computation of the sentencing. So it was returned to investors separately, and then it was taken into account, you think? I don't know whether it was returned to investors, but I believe it was taken into account in the computation of loss amount. What happened to the $1 million in the account at the time the government seized the assets? Did the government get it? The government seized it. What they did with it, I do not know. Okay. The last question, Mr. Howard, is tell me, so that we can have the government address it when they get up, why you think, given that no one actually got land, got the actual land, you think that the value of the Rumcay property should be credited against any loss amount? Because there are two sets of alleged victims, those who purchased and those who received lots of land as collaterals for loans. Both of them have their interest currently, as we stand, registered volume and page in the Bahamas Registry. The purchasers, in order to acquire title, would need to pay a stamp tax. However, the options which they own today, they can sell. They have not taken any action on it. One of the purchasers said that he abandoned his effort because he got a call from the case agent telling him his investment was no good. But as we stand here today, they own it as per the Bahamian Registry, all of the collateral interests are registered in the Bahamas, all of the purchasing interests are registered. That they don't go and monetize their investment is not an issue that should go to whether or not Mr. Foster should be credited. In addition to exercising the option, how much more would they have had to pay to acquire the land? Exercising the option by paying the stamp tax, the stamp tax was 10% of the purchase amount. Right, but how much more would they have to pay? It depends on the lot. It would depend on whatever the lot was. I mean, the payment of the stamp tax doesn't get you the land, right? You need to pay for the land. No, no. You need to exercise your option. Once they pay the stamp tax, they get the title, the land is theirs, period. So the option payment they made was for the value of the land? Yes. Do these options have an expiration date? They have an expiration date and the expiration date has since expired because I think there were five years each. Sunward, the executive director, testified they're willing to honor them into perpetuity. And as far as the collateral is concerned, which is the lion's share of the $8 million that was received, those have no expiration date and they currently sit as collateral in the Bahamian Registry as we stand here. Your Honor, I have nothing further. Thank you. Ms. Davidson. May it please the Court, good morning. Ron Davidson on behalf of the United States. With me at council table is Nicole Mariani who authored the briefs. If I can begin with the sufficiency argument. The elderly investors who took money from their retirement accounts believe that the investment in Paradise's mine was something like a diamond. They believed a U.S. company owned the land. They believed that that U.S. company was developing the land that it owned. It believed that celebrities were- I think we know what they believe. Yes. Tell us how, what the defendant represented was false. Certainly, Your Honor. Focus on the defendant's conduct. Yes, Your Honor. So the- I have no doubt these investors thought this was, they had title to the land. It was right there collateral and this was a beyond fabulous real estate investment. Certainly, Your Honor. So what did the defendant do in his conduct? What did he misrepresent? Certainly, Your Honor. So he withheld from the investors the fact that a felon, Billy Wayne Davis, was the purported owner of the land. They withheld the fact that this- What do you mean by purported owner? Who actually owned this land? Well, that's the million dollar question, Your Honor, because Mr. Davis says he owns the land, but he swore that he never paid for the land. So here you have Mr. Davis claiming that, or claiming he owns the land that he never paid for. And there's a competing group that's out there in the Bahamas that claims that they own the land. And who is that? I think it was the McDonald's or I forgot the exact name of that other party. So there is litigation. There are two opposing factions claiming the land. Mr. Davis, who swore that he never paid for the land, and this competing group. So Mr. Howard said, Paradise is mine, own the land. So what was the evidence at trial that showed Paradise is mine, did not own the land? Well, as you mentioned, Sunward Holdings executor testified that they did not own the land. There was no evidence of any title transferring to Paradise is mine. And no one received title from Paradise is mine. The absence of any record evidence showing Paradise is mine had title to the land negates or undermines Mr. Foster's claim on the webpage and to the investors that his company owned the land. There's no title to that. According to Sunward, who owned the land? Well, Sunward Holdings believe they own the land. That's a third group? Sunward Holdings is correct. There's Paradise is mine, Sunward Holdings, and then the people who were in the litigation with Sunward Holdings. But you said there were two sets of people in litigation with Sunward. Oh, no, I meant the McDonald's, the competing claim, and then Sunward Holdings. How about the other gentleman you mentioned? The McDonald's? No, Davis. Oh, Billy Wayne Davis worked with Sunward Holdings. So that Sunward Holdings, Billy Wayne Davis, Mr. Tompkins all have their claim. So Davis is, in your view, Sunward? Yes, your honor. He is related to Sunward Holdings. They entered into, I believe it's called a hypothecation agreement with Paradise is mine, where they say Paradise is mine, please sell our land. But that didn't transfer the land to Paradise is mine. It was a way to deceive the investors by sort of creating this cover. Tell the investors Paradise is mine owns the land so that no one will find out that Sunward Holdings owned the land. And you'll recall in the trial testimony, one of the investors said he was irate. He was very upset when he found out that Sunward Holdings on the option agreement was the company that owned the land. Because he thought Mr. Foster and Paradise is mine owned the land. But when he got his option agreement, it was an entirely different company, which upon further investigation revealed was related to this felon who said he never bought the land. So that's the first area of the misrepresentation. The true ownership, the nature of Billy Wayne Davis's interest, the litigation. There was no money going to development, right? So the investors were led to believe that there was this growth in Rum K, specifically in the Paradise is mine land. But I think it's like 0.3% of the money is actually going to the Bahamas. How much did the investor pay? I know they had a loan. They were given a loan purportedly to entice them to do it. You get you pay a little bit. We'll give you this great loan. How much did they pay per investor? In other words, how much did the investors get back or how much did they promise for them? How much did they actually pay to Paradise is mine? Oh, so within the breakdown of the $8 million, your honor, it was sort of complicated to figure out who were the investors and who were the purchasers. We didn't have the books of Paradise is mine. And so it was very difficult for us to say this particular investor of I think there were 70 invested and loaned the money versus this individual who in fact purchased the land. Because remember, from the government side, all we see is a bank account. And if we see $100,000 coming from a victim to Paradise is mine, we don't know of every single person whether that was a loan or that was a purchase of a land. We were relying on Mr. Howard's representations to the court that certain people had loan agreements versus were purchases of the land. Only certain individuals received some money back. And turning to the million dollars that the government sees, the government sees that money. It is currently being held by the U.S. Marshals pending the outcome of this litigation. And there was no credit in the guideline calculations for that million dollars because there was no evidence that Mr. Foster intended to return it to the victims. You'll recall the trial test. But for restitution purposes, that wouldn't matter. Correct, your honor. He should get credit for the million dollars if the U.S. Marshals distributes it to the victims, that million dollars will go back to satisfy the $8 million restitution. How many investors do we have, roughly? I thought it was about 70, your honor. And so that million dollars would go back. But for purposes... Do we have any idea of what they invested, approximately what they invested? I know you can't tell investors versus purchasers. Correct. The total amount in was about $8.3 million. I know that. What is an investor putting in? He's getting a 9.9% return. Correct, the investors. And I think, your honor, maybe I should clarify. Many of the purchasers also consider themselves investors because they intended to sell their options or... Well, I don't care if there's a purchaser or an investor. I'm just curious how much money people would give. Well, on average, it's got to be a little over $100,000 per person. If you divide 70, I mean, the $8 million by 70. Exactly correct, your honor. So they varied. Some invested more than $100,000. Some invested less. There is a government exhibit that lists all the individuals who put money in, the amount of money they put in. Does it put numbers by the individual? Correct, your honor. What's the exhibit number? I think it was in the 800 series. I could double check. But it was under Mr. Hysa, H-Y-S-A. He was the financial analyst. And it was one of the exhibits that we introduced through him. He went through the bank accounts, found the 70 or so investors, found how much money they put in and how much money they returned. We were operating under the assumption that any victim who got money back was probably a investor who was expecting a rate of return. Mr. Howard focuses on the mens rea element of Mr. Foster. And he says, if you look at the contractual provisions, there was a reasonable basis for Mr. Foster through Paradise to say that they own the land in terms of the contractual provision. So you need to respond to that. Yes, your honor. So what Mr. Howard presented to the jury was a series of, but if you look at this, this will explain that. For example, he talked about the hypothecation agreement where Paradise's mine entered in an agreement with Sunward Holdings. He talked about Joe Montana's contract and a separate provision in that contract. He spoke about in the brief, Ms. Brion's agreement were buried in the agreement itself as language that Paradise's mine could use the money however they see fit. Now, the jury was free to look at all the evidence at the trial and to listen to these very arguments from Mr. Howard. And I think what the jury did was look at this and say, wait a minute, why are you hiding this hypothecation agreement? Why are you hiding Sunward Holdings from your webpage? Why are you burying this language about use of the funds in the collateral provision? Why are you saying Joe Montana purchased land in the Bahamas where at best you are giving him land in the Bahamas? And the jury was free to reach inferences based on the record evidence and say, we think this is fraud. We think Mr. Foster designed all of this for the purposes of misleading people like Ms. Brion, of deceiving her, of cheating her out of the money, because what they presented to her was very different from what actually was going on. So the fact that Mr. Howard can point to a contract provision which says, look, there's a way of reading that contract, doesn't prevent the jury from reading it differently and seeing the evidence quite differently. And I think that's what the jury did. They saw Mr. Howard's arguments. They saw the record evidence. And they said, I don't think that's what's going on. They were free to infer from the record evidence. What about the USA Today and Wall Street Journal articles? Were there real articles? Well, as to USA Today, it could not have been an article, right? USA Today, A, did not publish that article. B, does not even put press releases on their webpage. So that was absolutely a lie. It could never have been on USA Today. At best, what happened with the Wall Street Journal was that it appeared on the feed where they put press releases. But there's a huge difference between your company's press release appearing on the Wall Street Journal press release section versus actually being a Wall Street Journal article and saying it's a Wall Street Journal article. Mr. Foster used the word article. And Ms. Harper said in her cross-examination that she would never say a press release is an article. And it's extremely important because land in the Bahamas is not something that you have credit agencies going around and saying, this is triple A or this is triple C. You have the Wall Street Journal saying, this land is undergoing development. And one of the investors or one of the purchasers testified, that's what I look at. I look at the Wall Street Journal, one of the most respected newspapers in this country, and I rely on that. And it was not a Wall Street Journal article. So the jury can look at that and say, the fact that Mr. Foster is referring to, quote, articles from the Wall Street Journal that are best press releases from Mr. Foster's own company was designed to steal money from that particular investor. Mr. Davidson, if at the time of trial and sentencing had the options expired? Some might have. I know by now they all have. But okay. Let me ask you a hypothetical question. If for those options that had not expired, if there was testimony that those options, despite everything else that happened, had economic value, should that economic value have been credited against the loss amount or at least against restitution? So your honor, we were sort of following your ruling in one of your cases involving loss from the perspective of the victim. In an esoteric sense, yes. There might be a hedge fund in New York that would sweep in and buy all of these option agreements and bundle them and find some financial dealing and way to sell that. But, Mr., I think it's Donnelly testified. This was one of the last questions on redirect. He does not- During trial or the sentencing hearing? Sentencing, your honor. During his sentencing hearing, he said, I do not affix any value to this option agreement. And that's important because it's the defendant's burden of showing that he gave something of value to the victims. Our victims here were elderly, predominantly elderly individuals who took money from their retirement account. And the risk portfolio of somebody investing from their retirement account is very different from a hedge fund manager or the real estate investor that Mr. Howard mentioned. Those risk portfolios are different. And the question is, when you give something to a victim, you have to look at it from the victim's perspective because there could be, as your honor pointed out, some esoteric value. There could be somebody out there who is willing to buy that. But when it comes to the victim's balance sheet, they assign either zero or negative value because they don't even know what to do with this. This is a piece of paper that they would have to go to the Bahamas, pay more money for, and if they tried to sell it- Isn't that the whole point? They'd have to pay at least the 10% stamp tax. Correct. And then- They'd have to come up with more money. Exactly, your honor. And they would have to maybe find a lawyer, find somebody to help them sell it, find some- And we don't even know if they could get clean title to the property, even if they did. There's a big title dispute going on. Exactly, your honor. I think that's what the district court was looking at and saying, none of our victims here value this option agreement. And as evidenced, as I think your honor suggested, none of them tried to exercise that option. Mr. Montana asked for it for a while and then just gave up, realizing that this is not going anywhere. And I think that's one of the things that came up in the Newton case, N-E-W-T-O-N, where a hedge fund was given, or I think it was a pension fund, was given penny stock. And the district court, and this court affirmed, said, wait a minute, there's no value to a pension fund in highly volatile, risky stock. And that's the same thing here. When you're looking at our victims, they don't assign any value to an option agreement to buy land owned by a convicted felon who's tied up in litigation, where there is no development, where celebrities didn't buy the land, there were no newspaper articles. From their perspective, this is a liability. And the question proposed to the district court was, what value do these victims assign to the land? The analogy would be giving a hamburger to a vegetarian. A hamburger has value to some people. It doesn't have value to the vegetarian. These victims are the vegetarians. I'm not sure this option had value to anybody. Because they can't get good title. Yes, Your Honor, I think... I don't know that it has to be all about the victim and the circumstances of the victim, but I don't know why this option has value. Didn't your expert say it had no value? One of the experts did assign general value to the land. There was another expert, we submitted his paperwork to the court, who said when there's evidence of fraud, the value is diminished. So I don't want to suggest that no one in the world might assign some value to these options agreements. I think there are sophisticated people out there, real estate developers who might come in and buy it pennies on the dollar. But that's not the question. The defendant has to show he assigned something of value to the victims from the victim's perspective. And this was just too much of a liability, too toxic for any of the victims really to come forward and say, I want this, I assign value to this. And so for that reason, remember, it's clear error. And I don't think the district court, looking at Mr. McCarty's testimony, for example, where half of the money was going to pay for sales, committed clear error in light of one victim saying, I don't assign any value on this. And he could rely on that testimony. I have one more question. Yes, Your Honor. What jurisdiction do you think the district court will have to revisit restitution? Well, six months to a year from now, if the conviction and sentence are affirmed? Well, I think the question, Your Honor, is slightly different. If I'm understanding your question is, if this court says, look, you needed to assign the value of the option agreements or whatever other land they come up with. No, no, no, I'm not talking about that. Oh, I'm sorry. I mean, obviously, if part of the sentence gets vacated, then you've got jurisdiction because you've got to go back and re-sentence Mr. Foster. I was talking about the $1 million in the bank, the roughly $1 million in the bank account. Oh, I see. That money gets distributed to the investors, right? Correct. They recoup some of their losses. Yes. What jurisdiction does the district court have to go back and revisit restitution and give Mr. Foster a credit for that? Your Honor, I have to double check to see whether the money is with the clerk of the court or with the marshals, but my- Doesn't matter. I mean, it hasn't, he never got credit for it so far, right? On the restitution order. Correct, because it hasn't been dispersed to the victims. I understand. If there's disbursement now post-judgment- Yes. Assuming, for purposes of my question, that Mr. Foster's conviction and sentence are affirmed- Yes. What jurisdiction does the district court have to go back and revisit the restitution order? Oh, I see, Your Honor. I think the restitution order is the $8.3 million minus whatever was sent. Right. The question is, now we have this money that will get the restitution payment. It's a matter of probation and handles the restitution. I think probation would give him a credit on that. Correct. But let's cover this. Does the government agree that if the conviction is affirmed and the sentence is confirmed, the government agrees that he's entitled to credit on the restitution amount in the $1 million if that's dispersed to the victims? Yes, Your Honor. Right. So that would just be a normal payment. For example, if Mr. Foster is able to sell the land- Well, it's no different than if somebody converted real property and then it comes into the registry of the court and gets- if you were holding real property, for example. Correct. If Mr. Foster sells land in the Bahamas and then deposits it with the registry of the court- I don't know. You go back to the court every time payments are made on restitution. But the important thing is the government stipulates that if the money is dispersed to the victims, obviously Mr. Foster gets credit for a reduction on the $8.3 million restitution. Yes, for the $1 million that was seized. And you stipulate to that. Yes, Your Honor. Okay. I think we have the case.  Thank you, Your Honor. Mr. Howard. Thank you, Your Honor. Briefly, there is a concern that Your Honor has expressed about the legitimacy of title. The only evidence in this record regarding the ownership of that land beyond the contract, which says it's jointly owned with Paradise is Mine, there are, I believe, three or four title opinions which all establish ownership in Sunward. The McDonald's to whom the government referred sued in Miami- Let's assume Sunward does have ownership. The fact of the matter is Paradise is Mine didn't have the title. Well, they didn't have title, but they claimed ownership based upon a contract. Don't you think anybody investing with Paradise is Mine reasonably, they had title, they had the property right there. Nothing more had to be. Can you really argue that a reasonable investor wouldn't think that? I would argue that a reasonable investor doesn't mind who owns the property if they get what they purchased. I think I want, when I'm buying from somebody, I think I'm buying from that person and they have the property. Sunward was not mentioned anywhere on the website, correct? They were not. Okay. And they're not mentioned anywhere in the documents, right? Not until after the documents were executed. Yeah, right. However, the notion of attaching some nefarious, we're trying to hide their ownership as opposed to- Why didn't you put it in your client's name? The ownership could have been in your client's name. I'm not understanding what the court said. Why didn't Sunward transfer it to Paradise is Mine, whatever interest they had, and Paradise is Mine then owned it? Well, because they contracted to own it jointly. So why they didn't, I can't speculate. But I will say this. This is what I wanted to make sure that the court understands. But Mr. Toppin says Paradise is Mine does not own the property. That was his testimony at trial. Was he prosecuted? There's further testimony from Mr. Toppin. Was he prosecuted, Mr. Toppin? Prosecuted? Mr. Toppin, the director in Sunward. Prosecuted for? Anything. No, not that. He wasn't charged. So he's not a government co-defendant, co-conspirator who has a deal for his testimony. No, no. He was called by the defense. Okay. But I would commend the court to that section of his testimony where he thereafter acknowledges that the contract says he has an ownership interest. That he owns it. He acknowledges that. His first statement was he has a propriety interest. The examination continued. We pointed out the specific language. He did acknowledge that ownership. But I did want to point out the fact that this notion that we're not even sure if Sunward owns it, particularly as it goes to collateral. The McDonald's, to whom the government referred, sued in case number 0314418CA03 in Miami-Dade County. That sued Newport Holdings, which is also a Billy Davis-owned company. And a subsequent Supreme Court decision in the Bahamas resulted in the transfer of Newport's holdings to Sunward. But in the Miami-Dade County, there was a voluntary county case. There was a voluntary dismissal during which the McDonald's acknowledged that Newport owned it. And then they went after that and filed another lawsuit in the Bahamas and never served it. And it's sitting there filed and unserved until this day. So there isn't this fight for title beyond them agreeing that they don't own it. Who is Newport? I'm confused. Newport Holdings is also held by Billy Wayne Davis. It's another company. And the land, pursuant to a Supreme Court decision in the Bahamas, was transferred from Newport to Sunward. And Newport is who was sued here. And the people who are claiming ownership of that land have conceded in a Miami-Dade Court that they don't own it. So Sunward does own it. The title does show in the Bahamas registry as having been transferred to the purchasers and the lenders. And I don't think that the court, what they contracted for was land in the Bahamas for which they had to pay a stamp tax in order to get title. To come back and say, well, now they have to pay a stamp tax and therefore we shouldn't credit them. That's the bargain they made. They intended to, if they needed to take title, to pay a stamp tax. They cannot now come and say, well, I have to pay a stamp tax and therefore it shouldn't be credited. And as far as the collateral is concerned for those who lend. Do you think a reasonable investor would think they were buying property that was being developed from all the representations here? That something was going on in their area that was development occurring from some of the money? The website never mentioned development anywhere. The contracts never mentioned development anywhere. They were being sold undeveloped land. There is nothing. If I go look at all the advertisements, all the claims, there's nothing in there about development of the property. Not a single one. So whether or not they developed that impression based on no evidence is a non-issue. The question is, what did Mr. Foster do? Maybe on the fake news articles. Could they develop that from the fake news articles? Well, and as far as it being called an article, Mr. Foster referred to it, to those press releases as an article once in a email to Mr. Bennett after he had already made his purchase. So his reference to it as an article could not have induced his purchase since it came after the fact. Otherwise, it said Paradise is Mine has been featured in these various publications. It did not say there were articles. It says they were featured. And we would contend that that is the type of puffery that is non-actionable. And the mere fact that it said 377 also gives an indication that they weren't all written by the publications themselves. Your time has expired. Thank you. But it's not a problem. And we notice that your court appointed Mr. Howard. And we thank you for your representation of your client. Thank you very much. I appreciate the opportunity.